[Filed December 19, 1888.]

# WILLIAM F. HAINES, Respondent, v. THOMAS HALL, Appellant.

NAVIGABLE STREAM — WHAT IS. — The doctrine that a stream of water is navigable if of sufficient extent and capacity to float logs and timber from mountainous regions to market, and may thereby be utilized for the benefit and advantage of the community at large, cannot be extended so as to include small streams of only a few miles in length, although they rise during a few weeks in the year sufficiently high to be used to a limited extent, by the application of artificial means, to float logs and timber a short distance.

EQUITY — COGNIZANCE OF IN CASE OF TRESPASS. — Equity will not take cognizance of an ordinary matter of trespass, or of the violation of any legal right, unless the circumstances are of such a character as to bring the case under some recognized head of equity jurisdiction. Equity will, however, afford a remedy in such cases where the remedy at law is incomplete and inadequate to give such relief as the nature of the case demands.

NAVIGABLE STREAM — CASE IN JUDGMENT. — Where a small stream of water only about twenty feet in width where confined within its banks, and about thirty-five in other places, ran across the farm of W. F. H. and emptied into another stream two miles below, which during four or five weeks in the year increased in volume, by the melting of snows in its vicinity, sufficiently to enable T. H. to float logs down it by stationing a large number of men along its banks "to break jams," by arranging logs along the stream so as to confine the water in a narrower channel at points where the banks were not sufficient to prevent its spreading out, and by constructing reservoirs above and opening them so as to make a greater flow in a given length of time: held, that the stream was not navigable in the sense which made it a public easement. And where it appeared that the attempted use by T. H. of the stream as mentioned resulted in destroying its banks, extending it in width, and diverting its waters from the channel, and causing them to overflow the land of W. F. H., which was in cultivation, and wash off the soil of a material part of his lands, and that T. H. claimed the right, and threatened to continue such practice, and it further appearing that W. F. H. had already sued a former party in an action at law for attempting to exercise a similar right, and had recovered the sum of fifty dollars as damages on account thereof: held, further, that equity should interfere and prevent T. H. from carrying his threats into execution.

STRAHAN, J., dissenting.

STREAM — TEST AS TO ITS NAVIGABILITY. — A stream which has sufficient capacity during seasons of high water continuing for a sufficient length of time to enable a person to float some logs to market, or to a place where

they may be manufactured into lumber, is subject to the public easement as a passage-way for such logs. To the extent that it is useful for that purpose, it must be deemed navigable.

ID. — CAPACITY — TEST OF. — The actual capacity and utility of a stream for the purpose of commerce, or the floating of logs or other commodities to market, is the test of the public right of passage.

PUBLIC RIGHT — LIMITED TO STREAM. — The public right is confined to the stream and measured by its extent, and does not extend to the shore.

DRIVING OF LOGS — USE OF SHORE. — The right to float logs on a stream does not include the right to occupy the shore for the purpose of aiding in driving them, or of dislodging those which have become jammed.

USE OF SHORE. — One floating his property down a stream has no right, without a license from the riparian owner, to use the banks of the stream to aid him.

MERE TRESPASS NOT ENJOINED. — The ordinary rule is, that a mere trespass will not be enjoined. Something more is necessary before equity will interfere, such as preventing irreparable injury, avoiding multiplicity of suits, and the like.

TORTS — WHEN NOT ENJOINED. — Ordinary wrongs or torts are never enjoined. The damages or injury sustained from them are not generally irreparable, and a party will be left to his remedy at law. *Semble*, when the injury complained of reaches the very substance and value of the estate and goes to the destruction of it, in the character in which it is enjoyed.

LORD, J., concurring.

NAVIGABLE STREAM. — A stream which has floatable capacity at certain periods, recurring with regularity, and continuing a sufficient length of time to make it useful as a highway for floating logs, is navigable; but, to be navigable in this sense, it must be capable of such floatage as is of practical utility and benefit to the public as a highway for trade and commerce.

NAVIGABLE STREAM. — Where the facts show that a stream is not navigable for floating logs without doing irreparable injury to the estate through which it flows, and the defendant claims a right to use such stream for that purpose, not only for himself, but for the public, and threatens to commit and claims the right to repeat the numerous trespasses which the exercise of such right necessarily involves: *held*, that the plaintiff was entitled to an injunction to prevent irreparable injury and to avoid a multiplicity of suits.

APPEAL from the Circuit Court for the county of Union.

*R. Eakin & Brother,* for Respondent.

*Baker, Shelton, & Baker,* and *G. G. Bingham,* for Appellant.

THAYER, C. J. — This appeal is from a decree rendered in a suit brought by the respondent against the appellant, to enjoin the latter from floating logs down what is known as Anthony Creek, and to have an account taken of damages done to respondent's premises in consequence of the appellant using and attempting to use said creek during the years 1886 and 1887.

The respondent owns two forty-acre subdivisions of land, situated partly in Union and partly in Baker counties, upon which he has resided for some time, using it as a farm. The creek is a small stream running through the land, down which the appellant claims and exercises the right of floating saw-logs during its highest stages of water, insisting that it is a navigable stream. The respondent denies its being navigable, and alleges that the appellant is doing irreparable injury to his land in attempting to use it for such a purpose. He also alleges that the appellant threatens to, and will unless restrained by the court, continue to use said stream, and that he has already suffered damages to a large amount, occasioned by the acts of the appellant in that particular. The respondent sought by his suit to have decided a question which is more within the province of a jury to determine than that of a court.

But the right to run saw-logs down this Anthony Creek has heretofore caused litigation. The case of *Haines* v. *Welch,* 14 Or. 319, arose out of a claim to damages in consequence of using it for such purpose; and the circumstances surrounding it are of a character that would indicate that it is liable to be a source of constant contention. Besides, the circuit court seems to have thoroughly investigated the affair, and given it a candid and judicious consideration. I think, therefore, it will be better for all parties to entertain jurisdiction of the case and make a final disposition of it.

The respondent may have been captious in regard to the use of the stream by the appellant, but the land belonged to him, creek and all, and the appellant had no right to attempt to run his logs down the creek, unless its capacity was such as to render it capable of serving an important public use as a channel of commerce.

The case is not one of casual trespass, but it is one where a right is claimed, which, it is apparent, will be attempted to be exercised continuously; and if the creek, as a matter of law applicable to the facts proved, is not a public easement, the appellant should desist from attempting to run his logs down it, and the respondent has the right to enjoy his premises unmolested.

The right to acquire private property is said by Blackstone to belong inherently to every one, but it would be of little value if a party were not allowed to enjoy it free from disturbance.

The circuit court in its findings found as follows: That the respondent was, and for nine years past had been, the owner in fee of the land; that it was inclosed by a fence, had a dwelling-house and outbuildings thereon, was occupied by respondent as a home, and had been used by him for general agricultural purposes during his ownership, and that it was of the value of eighteen hundred dollars; that Anthony Creek entered said land at or near the northwest corner, and ran in a southeasterly course, and passed out near the southeast corner, being a distance of about three fourths of a mile, considering the sinuosity of the stream; that it entered North Powder River a short distance below where it left the respondent's land; that the creek on the respondent's land, and for a mile and a half above there, is a small, shallow, rapid, crooked stream, with a general width of twenty to thirty-five feet, as it appeared in 1886, having banks from eighteen to thirty-five inches high, but which frequently fell away on one

and sometimes on both sides, leaving nothing but a gravel
bar for many feet, with little or no bank at all; the flow
of water in the creek during the previous summer and fall
was very limited, not exceeding twenty or thirty inches,
miners' measure; but usually during the latter part of
May and first of June the melting snows in the moun-
tains near by causes the water to increase until the banks
in narrow places are nearly full, but where the banks are
broken away on one or both sides, the water, unless con-
fined by artificial means, spreads out until it becomes a
depth of not more than sixteen or eighteen inches, even
in high water; the annual rise of the water is fairly regu-
lar in amount, time, and duration of occurrence; that the
banks of the creek on the respondent's land are composed
largely of black loam, which washes readily when disturbed
in any manner; that the width of the stream did not in-
crease materially for ten years prior to the spring of 1885,
but since that time it has increased one third; that in the
spring of 1886 appellant deposited in the bed of the creek,
at a point about one and a quarter miles above the re-
spondent's land, about one million feet of saw-logs, and
attempted to float them to a point below said land; that
eighteen men were engaged for twenty-five days in get-
ting these logs to float during the highest water of the
season, but the attempt was an utter failure; few, if any,
of the logs passed respondent's land at all, the drive being
less than two miles, and that there was no evidence show-
ing that the flow of water in that year was less than usual;
that no attempt was ever made to float logs in the stream
prior to 1883, and the attempts made in 1884 and 1885
were slight and unsuccessful; that in the spring of 1887
the appellant deposited in said creek, about a mile and a
quarter above the respondent's land, two million three
hundred thousand feet of saw-logs, for the purpose of
floating them to a point below said land; that only one

million four hundred thousand feet of these logs, and of the one million feet placed in the stream in 1886, and of an unknown quantity placed there prior to that time, ever reached their destination, a point about seven miles below where they were started; and that in order to secure such result, the appellant employed on two miles of the creek, and stationed along the bank, from twenty-five to thirty-five men with cant-hooks and other appliances to prevent the logs from lodging, to roll them back into the stream, drag them over gravel-bars, turn them around bends in the creek, break jams, etc.; that these men labored in this way on this particular two miles of creek twenty-seven days; that then the logs frequently formed jams, piling up in such quantities as to force large amounts of water out of the bed of the stream onto respondent's land; that in order to break these jams it was often necessary for eight or ten men to get hold of a single log with cant-hooks, and drag it for a considerable distance over bars, which process was continued until about a third of the logs in the jam were moved, when the others would usually float; that in attempting to navigate the stream, the appellant placed logs, where its banks were low, at an angle to the stream, so as to expose about one half their length to the action of the water, thereby forcing the water against the opposite bank, so as to increase its depth at that point; also built a reservoir above the respondent's land, so as by discharging it to increase the volume of water in the creek; that while attempting to float logs, the water in the creek constantly overflowed by reason of logs being in it; the creek was almost full of logs for thirty-eight days; at one time sixteen hundred of them were in the creek on respondent's land; for five days a thousand logs were in the creek on his land, and not one moved; in 1887, 276 logs were at one time on the bank of the creek on respondent's land, and

51 were left in the stream, and 130 out of the stream on his land; that in floating logs both in 1886 and 1887 the appellant washed out the respondent's fence where it crossed the creek, and washed out his private bridge, which he had used for many years for passing to and from different parts of his farm; that in attempting to navigate said stream, appellant had committed no less than thirty separate and distinct trespasses, many of them irreparable in their nature, and that he threatened to continue such trespassing; that Anthony Creek is not capable of serving an important public use as a channel of commerce by the floating of saw-logs, and that such floating cannot be done so as to be of practical benefit; that by reason of the wrongful acts and injuries committed by the appellant in attempting to navigate said creek in the years 1886 and 1887, the respondent had been damaged in several amounts, aggregating the sum of three hundred dollars.

I have examined the evidence submitted in the case, and think it fairly supports the findings of the court; nor do the appellant's counsel, in their brief, attempt to show to the contrary, except as to the amount of damages which the court found to have been sustained by the respondent.

The nature of the damages was such that the amount could not be ascertained by direct proof; they were of such a character that they could not be computed with mathematical accuracy.

In this kind of cases a party can do nothing more than to prove the facts and leave the jury, or court when tried without a jury, to estimate the damages. The respondent could not possibly show the amount of his injuries in dollars and cents; the greater part of the injury doubtless consisted in the annoyance, perplexity, and disturbance to which the respondent was subjected in consequence of

the acts of the appellant; and it is the province of a jury or court in such a case to make a fair estimate of the amount which a party should pay for occasioning such annoyance, perplexity, and disturbance.

This affair of the appellant's attempting to navigate his logs down Anthony Creek through the respondent's land has been going on during two seasons, and in any view was wrong. If he had a right to use the waters of the creek for such purpose, he had no right to station his men along its banks to float the logs, or allow the logs to go onto the respondent's land or injure the banks of the creek, or turn the stream out of its banks onto the land.

No one has the right to use the property of another for his own convenience without the consent of the latter. The right to acquire, enjoy, and control private property in any manner not injurious to the rights of others is a natural as well as a constitutional right, and no injury arising out of an infringement of it should be allowed to pass unredressed.

Whether the creek in question is navigable or not for the purposes for which the appellant used it depends upon its capacity in a natural state to float logs and timber, and whether its use for that purpose will be an advantage to the public. If its location is such and its length and capacity so limited that it will only accommodate but a few persons, it cannot be considered a navigable stream for any purpose. It must be so situated and have such length and capacity as will enable it to accommodate the public generally as a means of transportation.

A stream that cannot be used without employing the means and appliances which the appellant made use of in order to float his logs down this one certainly ought not to be regarded as a public highway for any purpose.

The circuit court found, as we have seen, that Anthony Creek is not capable of serving an important public use

as a channel of commerce; and I think its findings in that particular is fully warranted by the evidence in the case. Courts went to the extreme verge of authority to interfere with or abridge private rights when they held that a stream of water included within a private grant constituted a public easement in any case. Such holdings bear a strong resemblance to the encroachment upon the immunity guaranteed in the constitution that private property shall not be taken for public use without just compensation.

It would, in my opinion, be much more in consonance with the spirit and principles of our government to have left the matter to be regulated by the legislature, which has authority to pass laws for establishing public highways, and to provide for such compensation.

We are, however, committed to the doctrine that a stream of water which is of sufficient extent and capacity to float logs and timber from mountainous regions to market, and can be utilized thereby for the benefit and advantage of the community at large, notwithstanding it is included with the land owned by private individuals, is, nevertheless, a public navigable stream for such purposes; and we must accept that doctrine as the law. But I am not willing to extend it so as to include every little rivulet or brook which runs across a man's farm, although its waters may be so swollen for a short time every year by the melting snow in its vicinity as to enable logs and timber in limited quantities to float down it, and, by the adoption of extraordinary means for that purpose, convenience one or two neighbors in so using it.

The appellant's counsel strongly insist upon the rule that a court of equity will not entertain jurisdiction in ordinary matters of trespass. I am mindful of the rule, and have no intention or desire to depart from it. I would not undertake to maintain that a court of equity has juris-

diction to take cognizance of the violation of any legal right, unless the circumstances are of such a character as to bring the case under some recognized head of equity jurisdiction.

Equity, however, affords a remedy to enforce a legal right when the remedy at law is incomplete and inadequate to give such relief as the nature of the case demands; and I think the respondent can reasonably invoke the benefit of that principle in this case. I do not regard it as an ordinary case of trespass; the respondent has his little farm, which he is endeavoring to cultivate, in order, I suppose, to provide a living for himself and family. Parties interested in timber a short distance above his farm claim the right to float it down a small stream which runs through his premises, to his detriment and annoyance. He has already had litigation with one party for attempting similar acts. That fact is alleged in the complaint in this suit, and the records of this court substantiate it. He brought an action in the said circuit court against a certain party on account of similar acts, and recovered a judgment against him for the sum of fifty dollars damages, which this court in the case before referred to affirmed.

Thereafter, this appellant engaged in the same scheme; and others we may presume are liable to engage in it also; and if the respondent were compelled to protect himself by bringing an action for each trespass, it would soon utterly impoverish him. The evidence in the case shows, and we can easily understand, that the injury, being done to his premises on account of such acts, is permanent and irreparable; and he certainly ought to have the right to have it specifically determined as to whether or not they are subject to the servitude claimed. It is the only way I can discover by which the right and title to the premises can be effectually quieted. The respondent,

it is true, can have it determined in an action at law as to whether or not the stream is navigable as claimed; but in the mean time the appellant will be enabled to destroy its banks, thereby widen the stream and wash away other portions of the soil adjacent thereto, which will be the natural and proximate result of the course he has been pursuing.

I am of the opinion that the decree appealed from should be affirmed.

Strahan, J., dissenting.—The object of this suit is to restrain the defendant from floating saw-logs down Anthony Creek, which creek flows through the plaintiff's lands, in Union County, Oregon; also to restrain the defendant from maintaining a certain dam across said creek above the plaintiff's premises, and for damages which it is alleged the plaintiff has received by reason of various trespasses upon his lands by defendant, committed in running said logs.

The plaintiff, by his amended complaint, alleges, among other things, that a small, shallow stream, known as Anthony Creek, flows in a southeasterly direction through plaintiff's land, diagonally dividing it in two equal parts, and fertilizes and irrigates said land, and is the boundary line between Union and Baker counties, and that the plaintiff owns both banks and the bed of said Anthony Creek, where it passes through his land, for a distance of about one half a mile; that the defendant, during the spring and summer of 1886, and the winter of 1886 and 1887, cast and deposited in Anthony Creek, above plaintiff's said lands, saw-logs cut from timber above plaintiff's said lands, at various places, and is proposing and threatening to continue to do so for the purpose of attempting to transport or float said logs by means of said creek from said places through the plaintiff's said lands to a point

on North Powder River, below the plaintiff's land, and below the mouth of Anthony Creek, a distance of five miles or more, where the defendants are preparing to erect a saw-mill as soon as the spring freshet comes in the spring of 1887; that said logs amount to more than four million feet, and are piled and banked into and along the banks of said creek at various places above plaintiff's said land; that during the spring of 1886 the defendant cast and deposited in said creek a large quantity of saw-logs, and in the month of June, 1886, attempted to drive and float about one million feet of said logs down said creek and across the said lands of the plaintiff, by means of which and whereby the defendant injured, displaced, and wasted the plaintiff's said lands, and tore, cut, and carried away the substance of the soil thereof, and wrongfully committed waste thereon, and upon the plaintiff's said lands; that about the first of June, 1886, the defendant and his employees, in preparing and attempting to float said logs, broke the plaintiff's inclosure upon said lands, and wrongfully entered the plaintiff's said lands, and broke and carried away his fences at two places where the same crosses said creek upon the plaintiff's said lands, to his damage in the sum of twenty-five dollars; and by reason of the same being broken and kept open by the defendant, plaintiff was compelled to and did herd the stock off of his crops for one month, to his damage in the sum of twenty-five dollars; that about June 11, 1886, the defendant, in preparing to float said logs in said creek through the plaintiff's said lands, broke up, carried away, and destroyed plaintiff's bridges across said stream, to his damage in the sum of five dollars; that during the month of June, 1886, defendant in so attempting to float said logs in said creek caused the same to form a jam or dam across said creek, and dammed the same at a point above the plaintiff's lands, and at the

head of the plaintiff's irrigation ditch, whereby the water was diverted from said ditch and the same was injured, and the plaintiff was thereby and by reason thereof deprived of the use of the water of said creek upon said lands of the plaintiff for the purpose of irrigation, to his great damage in the sum of seventy-five dollars; that in so attempting to float said logs in the month of June, 1886, the defendant floated, rolled, and pushed upon the plaintiff's said land in said creek a large quantity of logs, to wit, about 250, and that said logs so remained and still remain on the plaintiff's said land, and on the banks of and in said creek, to plaintiff's damage in the sum of one hundred dollars; and by reason of said logs being in said creek since June, 1886, plaintiff has been prevented from getting to said creek with his stock, except with a great deal of trouble and inconvenience, to plaintiff's damage in the sum of five dollars; that by reason of said logs being in said creek on plaintiff's said land, the same has caused, and continues to and will cause, the water of said creek to wash away the banks thereof, and change the channel thereof, and has during all of said times obstructed the flow of the waters of said creek across said lands of plaintiff, to his damage in the sum of ten dollars; that in preparing and attempting to float said logs in said creek in June, 1886, the defendant cut down and destroyed eight of plaintiff's growing trees on said land, to his damage in the sum of twenty dollars.

All of the foregoing wrongs were suffered by the plaintiff, as he alleges, prior to the commencement of this suit. The part of the amended complaint relating to threatened injuries is as follows: That said creek is shallow, and not navigable for boats or canoes, and has low banks, and in its natural state is not navigable for railroad ties or saw-logs except in the spring freshet or rainy season of the year, and is unfit to be used by the public or otherwise as a

means of transporting or floating logs to the defendant's proposed saw-mill on North Powder River or elsewhere through the plaintiff's said lands; that the defendants are preparing to and will float or attempt to float a large quantity of saw-logs down said Anthony Creek from a point on the banks thereof above the lands of the plaintiff, to wit, about four million feet of said logs, down said stream through said lands, to North Powder River, and threatens to continue to float or attempt to float said logs down said stream through plaintiff's said lands for years to come; that by reason of the nature of said stream, low banks, and small volume of water and narrow channels, it is not possible to successfully float logs down it through the plaintiff's lands, to be beneficial to commerce or to the defendant, and any attempt to do so will result in irreparable injury to the plaintiff's land; that said attempt to so use said stream will result in endless litigation and a multitude of actions without a complete remedy to the plaintiff, unless the court inhibit and restrain the defendant from so floating logs in said stream; that the floating of logs in said Anthony Creek, the maintaining and manipulating of said dams by the defendant, as threatened by him, will result in great and permanent injury to the plaintiff's said lands, and will cut away the banks of said stream, change the channel thereof, flood plaintiff's lands with water, deposit thereon logs, gravel, and *debris*, wash out and cut away the meadow and soil from plaintiff's said land, interrupt the plaintiff in the tillage of said land, and the caring for his crops and stock thereon, cause the removal of plaintiff's fences, and expose his lands and crops to the trespasses of stock, and that such threatened trespasses, injuries, and damages by the defendant will necessarily result in irreparable injury to the plaintiff's said lands, and great damage to the plaintiff, which cannot be compensated in damages, and, unless

restrained by this court, will result in the financial ruin of the plaintiff.

Before the defendant answered the amended complaint, the plaintiff, by leave of court, filed a supplementary complaint, in which it is alleged that the particular damages which plaintiff feared have been sustained by him by reason of the attempt by the defendant to run said logs down said stream, the particular items of which are specified, aggregating about $955. The answer to the amended as well as the supplemental complaint denied almost all of the material allegations therein except the cutting and putting in of the logs, and the defendant's intent to run the same down said stream to North Powder River.

By way of separate defense it is alleged that said Anthony Creek mentioned in said complaint is a navigable stream for saw-logs, railroad ties, and other timber, and can be successfully used in transporting and floating logs, ties, and other timber down the same through the plaintiff's said land; and other parts of said creek can be thus used beneficially to commerce during the annual freshets in each year, in ordinary seasons.

The evidence was taken upon an order of reference for that purpose, and the cause tried by the court, and a final decree entered in favor of the plaintiff, enjoining the defendant, his agents and servants, from floating logs in said stream across the plaintiff's land, or attempting to do so, and for three hundred dollars damages, and for costs and disbursements, from which decree this appeal is taken.

1. It appears from the evidence that Anthony Creek is a small, rapid, and somewhat tortuous mountain stream, taking its rise only a few miles above the plaintiff's lands and empties its waters into North Powder River, a few miles below. Where it flows through plaintiff's lands, it varies in width from ten to thirty feet; its banks are low and alluvial, and lined with a dense growth of willows,

except at four different places, one 84 feet, one 135 feet, another 100 feet, and still another place 110 feet. The depth of the water is from two to four and one half feet deep. The stream is mainly fed by mountain springs, but during the months of June and July of each year it is swollen by the melting snow in the mountains, at which times it is capable of floating saw-logs to a limited extent, from a point above plaintiff's lands, to its mouth. The defendant floated sixteen hundred thousand feet of logs down said stream during the year 1886. But I think it evident the defendant, in his anxiety to get logs to his mill, forced the stream beyond its capacity. In other words, he put a greater quantity of logs in said stream than could be conveniently floated, and thus caused them to jam so that their progress was stopped until relieved by gangs of men using cant-hooks and other appliances. To accomplish this the men engaged in driving traveled up and down the banks of the stream on the plaintiff's land, doing no greater injury to the premises than walking over the same.

By the common law, all streams are navigable where the tide ebbs and flows, while all others were held not to be navigable; but this distinction has not generally prevailed in this country. The true test seems to be whether or not the particular stream is navigable in fact; that is, capable of being used for transporting to market the products which grow along its banks. Nor is it necessary that it should be at all times capable of being so used. If a stream during seasons of high water continuing for a sufficient length of time to enable any person to float saw-logs to market, or a place where they may be manufactured into lumber, such stream is subject to the public use as a passage-way, and to the extent that it is useful it must be deemed navigable. (*Weise* v. *Smith*, 3 Or. 446; *Felger* v. *Robinson*, 3 Or. 455.)

In the latter case it was said by this court: "We hold the law to be, that any stream in this state is navigable on whose waters logs or timbers can be floated to market, and that they are public highways for that purpose, and that it is not necessary that they be navigable the whole year to constitute them such. If at high water they can be used for floating timber, then they are navigable; and the question of their navigability is a question of fact, to be determined, as any other question of fact, by a jury. Any stream in which logs will go by force of the water is navigable." And the same doctrine is asserted by this court in *Shaw* v. *Oswego Iron Co.*, 10 Or. 371.

Numerous other authorities are to the same effect. (*Brown* v. *Chadbourne*, 31 Me. 9; *Olson* v. *Merrill*, 42 Wis. 203; *Morgan* v. *King*, 35 N. Y. 454; *Hickok* v. *Hine*, 23 Ohio, 523; *Whisler* v. *Wilkinson*, 22 Wis. 572; *Sellers* v. *Union Lumbering Co.*, 39 Wis. 525; *Holden* v. *Robinson Mfg. Co.*, 65 Me. 215; *Gerrish* v. *Brown*, 51 Me. 256; *Morgan* v. *King*, 30 Barb. 1.) I think these authorities abundantly show that actual capacity and utility of a stream for the purpose of floating logs or other commodities to market is the test of the public right of passage.

Nor is this right of passage lost or impaired because in its exercise trespasses may have been committed on the premises of the riparian proprietor. In a proper action the wrong-doer is responsible to such riparian owner for all such damages. The public right is confined to the streams and measured by its extent, and does not extend to the shore, except under particular circumstances to land or to secure the floating property to the shore temporarily and in a reasonable manner, and so as not to obstruct others in the free use of the stream. Such right in the use of the stream does not include the right to occupy the shore for the purpose of aiding in driving logs or dislodging those which have become jammed.

The right to raft logs down the stream does not involve the right of booming them upon private property for safe-keeping and storage any more than the right to travel a highway justifies the leaving of wagons standing indefinitely in front of private dwellings or stores. (*Lorman* v. *Benson*, 8 Mich. 18.) Perhaps the true rule of law on this subject is stated by Ryan, C. J., in *Olson* v. *Merrill*, 42 Wis. 203. He said: "We of course recognize the position that the navigable character of a stream cannot depend upon trespass on the shore, and that one floating his property down a stream has no right without a license to use the banks of the stream to aid him. But it appears to us to be begging the question to assume that because it is convenient, and persons are accustomed so to use the banks, therefore the stream is not navigable without trespass upon them. We take it that a stream which is of sufficient capacity to float logs is of sufficient capacity to float some kind of boat or skiff in which the owner may follow his logs. And if there be some places where, in consequence of bars or other obstructions, neither logs nor boat will pass without human help, the boat may be aided down the stream as well as the logs, so that the logs may be floated through the streams without trespass upon the banks. This might probably be inconvenient, and even sometimes dangerous. But the stream is none the less navigable because persons using it are induced by convenience to prefer unlawful to lawful means in aid of the use. Indeed, we gather from cases which have come before us that the same practice prevails on some of the larger streams in this state. But the navigable character of a stream does not rest on the tortious practice, but on the capacity of the streams to be lawfully used. And we cannot hold that the right to use a public highway, by land or by water, is lost even by habitual trespass upon adjoining lands."

So it was said by the Supreme Court of Maine, in *Hooper* v. *Hobson,* 57 Me. 273: "The right of the public in a stream capable of being used for floating logs, or as a passage-way for boats and barges of sufficient capacity to be useful in commerce or agriculture, is not thus to be extended over adjoining lands.   The water makes and defines the highway.   The facilities of transportation afforded by it are privileges which, like those of air and light, are too great to be suffered to become the subjects of private property.   But the exercise of the common privilege must not be made an occasion for encroachment upon that which is legitimately the exclusive property of another.   The right which the public enjoy in a navigable or floatable stream is, in general, limited by its banks. The proper definition of the word 'bank' in this connection is, a steep acclivity on the side of a lake, river, or the sea.   These banks are the boundaries within which the exercise of the common right must be confined.   Except during the continuance of an overflow, or in the exercise of those privileges which are given and defined by statute, log-owners and river-drivers have no rights in a floatable stream beyond those boundaries.   Important as their business undoubtedly has been and is, it must be conducted with due regard to the rights of others.   Their liability to pay damages to the riparian proprietor for traveling upon the banks to propel their logs is expressly recognized in *Brown* v. *Chadbourne,* 31 Me. 9, relied upon by the defendant here."

In *Brown* v. *Chadbourne,* 31 Me. 9, referred to in the above extract, the doctrine under consideration is thus stated: "If the plaintiff and others were in the habit of going upon the banks of Little River to drive their logs, it does not appear but that they might have confined themselves to its waters, though it might be more inconvenient for them so to have done.   Their want of care in

the use of the river, creating a necessity to commit trespasses to relieve their property, would not prevent it from being public; nor justify the defendant in obstructing it. They would be responsible in damages for any trespasses committed."

2. But without at this time deciding whether or not Anthony Creek is a *floatable stream* for saw-logs in which the public have an easement for that purpose, it appears to me that this suit ought not to be sustained for other and different reasons from those already suggested. If this creek be not a floatable stream in which the public have an easement, all of the acts of the defendant on the stream where it runs through the plaintiff's lands, as well as those upon the land itself, were trespasses; for which he is liable in an action at law.

The ordinary rule in such cases is, that equity will not interfere to enjoin a trespass. Something more is necessary before equity will interfere, such as preventing irreparable injury, avoiding a multiplicity of suits, and the like. Chancellor Kent says, in *Livingston* v. *Livingston*, 6 Johns. Ch. 497: "There must be something *particular* in the case so as to bring the injury under the head of quieting possession, or to make out a case of irreparable mischief, or where the value of the inheritance is put in jeopardy."

Ordinary wrongs or torts are never prevented by injunction. The injuries they inflict are not irreparable, and in such case the party must be left to his remedy at law. (*Cross* v. *Mayor of Norristown*, 18 N. J. Eq. 315; *Mulvany* v. *Kennedy*, 26 Pa. St. 44; *Gause* v. *Perkins*, 3 Jones Eq. 177; Willard's Equity, 382.)

It is not doubted that where the injury complained of reaches to the very substance and value of the estate, and goes to the destruction of it in the character in which it is enjoyed, such injury may be prevented by injunction.

But I think the proof fails to make a case within this principle. Conceding the stream to be private, the floating of the logs on it across plaintiff's land would not constitute such injury, nor would the use of the banks to assist in driving them. I cannot find from the evidence that the logs caused any *debris* deposited on plaintiff's land, or that the banks of the stream were broken or washed by reason of the logs passing down the same.

3. Nor will an injunction be allowed unless the right set up and sought to be protected is free from all reasonable doubt. (2 High on Injunctions, sec. 698.) Nor when the defendant is in possession until the title is established at law, unless a strong case of irreparable mischief is made out, nor where the plaintiff's title is in dispute and has not been established at law. (2 High on Injunctions, sec. 698.) By this suit we are called upon to determine the title to this stream, and to assess damages growing out of its alleged wrongful use by the defendant. His right to use it depends upon the facts which ought to be tried by a jury, and the estimate of damages, if any, made by them. They are questions peculiarly within their province, and I think ought not to be withdrawn from their consideration. To allow a case like this to be finally determined in equity would be to make a precedent which, if followed, would invade the right of trial by a jury in a large class of cases where the constitution declares the same shall remain inviolate.

[Filed March 14, 1889.]

LORD, J., concurring.—That the stream in question was not navigable within the meaning of the authorities for the transportation of timber or logs, and is not subjected to the public rights of user for that purpose, seems to me to be established by the testimony beyond controversy. Even the testimony for the defendant is pregnant with proof

that the stream cannot be used for this purpose without constant and continuing trespass when used for floating logs, and that in its natural state it is not of sufficient depth and width to float the products of the forest to market.

It is hardly possible to read the testimony, in which it appears numerous men were placed along the stream to aid and push the logs along its channel, of the jams and standing of the logs, in consequence of its want of depth and width for such floatage, of the destruction of its banks in several places, and the overflow on the adjacent lands of the plaintiff incident to such use, and the injury necessarily resulting therefrom, without the conviction that the stream has not navigable capacity and is not susceptible of beneficial use to the public for that purpose.

We do not mean to say by this that to be navigable a stream must have a sufficient volume of water to be at all times and during all seasons capable of being used for the purpose of valuable floatage, and as a channel of trade and commerce. It is enough if it has floatable capacity at certain periods, recurring with regularity and continuing a sufficient length of time to make it useful as a highway for floating logs. Such has been the holding of this court. (*Folger* v. *Robinson*, 3 Or. 457; *Shaw* v. *Oregon Iron Co.*, 10 Or. 381, 382.) But a stream to be navigable in this sense must be capable of such floatage as is of practical utility and benefit to the public as a highway for trade, or, as has been said, "to float the products of the mines, the forests, or the tillage of the country through which it flows, to market."

Perhaps as good a test of the navigability of such streams is found in the case of *Rhodes* v. *Otis*, 33 Ala. 578. It is there said: "In determining the character of a stream, inquiry should be made as to the following points: Whether it is fitted to valuable floatage; whether the pub-

lic or only a few individuals are interested in transporta-
tion; whether any great public interests are involved in
the use of it for transportation; whether the periods of
its capacity for floatage are sufficiently long to make it
susceptible of use beneficially to the public; whether it
has been previously used by the people generally, and
how long it has been so used; whether it was meandered
by the government surveyors or included in the surveys;
whether, if declared public, it will probably in future be
of public use for carriage." (*Pelies* v. *Railroad Co.*, 56
Ala. 528.)   Tested by this rule, there is scarcely a partic-
ular in which the stream in question would not be con-
demned as non-navigable for the transportation of logs.
It is not only not adapted to a public use, but the public
have made no attempt to use it for any purpose.   It is,
therefore, perfectly evident that the defendant has no
right to float logs down this stream through the lands of
the plaintiff.   While this, however, is not much contested,
it is strenuously urged that the question of navigability
is a question of fact for a jury, and the case, therefore,
does not authorize the interference of equity.   But this
is not so.

The case of *Meyer* v. *Phillips*, 97 N. Y. 490, is so on all
fours with the case in hand, and so direct an adjudication
and authority for such equitable interference, that we quote
it *in extenso.*

"But it is claimed," says Earl, J., "that the facts of this
case do not authorize equitable interference or sustain the
jurisdiction of an equity court.   The defendants threat-
ened to float a larger number of logs over the plaintiff's
land, using the stream and its banks for that purpose, and
they would thus do some damage to the banks of the
stream and other lands of the plaintiff.   They would
occupy the stream for several days.   Not only this, they
claimed the right to float the logs, and asserted in sub-

stance that they would do so whenever they chose to. By continuing to exercise the right, they might, by lapse of time, be able to prove and establish a right by prescription. They not only claimed a right for themselves, but for the public,—for everybody. That in such a case, upon such facts, a plaintiff may maintain an equitable action to quiet his title and settle his right, and prevent the threatened injury, is abundantly settled by authority. (Angell on Watercourses, sec. 449; 2 Story's Eq. Jur., sec. 927; 3 Pomeroy's Eq. Jur., sec. 1351; *Holsmar* v. *Boiling Spring Co.*, 14 N. J. Eq. 335; *Campbell* v. *Seaman*, 63 N. Y. 568; *Johnson* v. *City of Rochester*, 13 Hun, 285; *Swinton Water Works Co.* v. *Wilts and Berks Canal Co.*, L. R. 7 H. L. 697; L. R. 9 Ch. 451; *Clowes* v. *Stafforshire Potteries*, 8 L. R. 9 Ch. 125, 142.) This is not a case where the defendants threatened only to commit a single trespass, but they threatened to commit and claimed the right to repeat the trespass every year. Here a preventive action was proper to prevent an irreparable injury within the meaning of the equitable rule, and also to avoid a multiplicity of suits."

The case in hand possesses all these features, with added aggravation. It is incontestable that the stream would not float these logs without extraneous aid, and in rendering this the banks had to be used, and were damaged, and in places destroyed, and the plaintiff's meadow overflowed and rendered useless.

The facts show that in the attempt to make the logs float down the stream, thirty or forty men were employed with cant-hooks and other appliances, for the period of twenty or thirty days during the season of highest water, to aid in the transportation of these logs; that in this attempt to navigate the stream for this purpose no less than thirty separate and distinct trespasses were committed, many of them irreparable in their nature, and

reaching to the destruction of the estate in the character in which it was enjoyed.

The defendant not only asserts his right to use the stream for such use, but he claims a like right for the public. More: he threatens to commit and claims the right to repeat, not a single trespass, but the innumerable trespasses which the facts show must follow its exercise; that, in such case, the plaintiff is entitled to an injunction to prevent irreparable injury, and to avoid a multiplicity of suits, is established by the authorities beyond controversy.

The motion for a rehearing is denied.